# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | |
| | **)** | |
| **v.** | **)** | **06-CV-673-GKF-FHM** |
| | **)** | |
| **STATE OF OKLAHOMA, et al.** | **)** | |
| | **)** | |
| **Defendants.** | **)** | |

## CONSENT DECREE

## I.  INTRODUCTION

1.    This Consent Decree ("Consent Decree") resolves litigation concerning protection from harm, prevention of suicide and self-harm, mental health care, and special education services in <u>United States v. State of Oklahoma, et al.</u>, 06-cv-673-GKF-FHM (N.D. Okla. 2006).  This litigation concerns conditions of confinement at the L.E. Rader Center ("Rader") in Sand Springs, Oklahoma, and was brought pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").

2.    On March 31, 2004, the United States notified State of Oklahoma ("State") officials of its intent to investigate conditions of confinement at Rader pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Section 14141.

3.    On June 8, 2005, the United States issued a findings letter pursuant to 42 U.S.C. § 1997(a)(1), which alleged that certain conditions at Rader violated the constitutional rights of juveniles confined at Rader.

4.    The purpose of this Consent Decree is to resolve the protection from harm, prevention of suicide and self-harm, mental health care, and special education claims in this litigation.

5.     The Defendants in this action are the State of Oklahoma; the Oklahoma Office of Juvenile Affairs ("OJA"); the Oklahoma Board of Juvenile Affairs; Brad Henry, Governor of Oklahoma; Robert E. Christian, Executive Director of the Office of Juvenile Affairs; Charlie Jackson, Chairman of the Oklahoma Board of Juvenile Affairs; Everett Gomez, Superintendent of the L.E. Rader Center; and their successors, contractors and agents.

6.     This Consent Decree is between the Plaintiff and two of the Defendants, the State of Oklahoma and the Office of Juvenile Affairs (collectively "Parties").  All remaining Defendants are not parties to this Consent Decree and no finding by the Court in relation to this Consent Decree shall be construed as a finding against the Defendants, except the State of Oklahoma and the Office of Juvenile Affairs.

7.     For the purposes of the Consent Decree only and in order to settle this matter, the Parties stipulate that this Consent Decree complies in all respects with the provisions of the Prison Litigation Reform Act, 18 U.S.C.§3626(a) ("Stipulation").

8.     The issue of liability has not been litigated and in the event that this Consent Decree is terminated prior to completion, the Plaintiff and all Defendants agree that the issues regarding the alleged violations will be litigated in full and that this Consent Decree is not binding on the Court with regard to those issues.

9.     This Consent Decree and Stipulation is not intended to have any preclusive effect except between the Parties during the term of the Consent Decree.  Should the issue of the preclusive effect of this Consent Decree be raised, the Parties agree to certify that this Consent Decree was intended to have no such preclusive effect.

10.     The United States and the State of Oklahoma stipulate and agree that all of the prospective relief in this Consent Decree is narrowly drawn and extends no further than necessary.

11.     No person or entity is intended to be a third-party beneficiary of the provisions of this Consent Decree for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or

2

right as a beneficiary or protected class under this Consent Decree. This Consent Decree is not intended to impair or expand the right of any person or organization to seek relief against the State, OJA, or State officials, employees, or agents for their conduct or the conduct of OJA employees; accordingly, this Consent Decree does not alter legal standards governing any such claims, including those under Oklahoma law.

12.     Nothing in this Consent Decree shall prevent the State from modifying or closing Rader, or developing alternative placements for the youth currently in the facility.

13.     The United States does not concede that the use of the words "continue to" in this Consent Decree implies that the State has already been meeting the needs of the youth in each area.

14.     The parties to the Consent Decree are the United States Department of Justice and the State of Oklahoma and the Oklahoma Office of Juvenile Affairs, their successors, contractors and agents. While not named in this Consent Decree, the parties recognize that the cooperation of other state agencies will be required to comply with this Consent Decree.

## II. DEFINITIONS

In this Consent Decree, the following definitions apply:

15.     "Arms Length" means documented continuous, direct, uninterrupted, one-on-one supervision, within three feet of the youth, who is placed in the crisis management unit.

16.     "Close Observation" means a systematic documented visual observation of youth at all hours and interaction with youth during waking hours periodically, but at least every ten minutes around the clock.

17.     "Constant Observation" means documented continuous staff observation of a youth, or line of sight supervision.

18.     "Direct Care Staff" means staff members who have routine contact with youth, including youth care staff, security staff, teachers, nurses, and food care workers who supervise  youth.

19.     "DOJ" means the United States Department of Justice, which represents the United States in this matter.

20.     "Effective Date" means the date the Consent Decree is signed by the Court.

21.     "Implement" means to give practical effect and ensure actual fulfillment by concrete measures.

22.     "Include" or "including" means "include, but not be limited to" or "including, but not limited to."

23.     "Isolation" means placement of a youth alone in a locked room. The term isolation does not apply to locking a youth in a room during the hours of 9:30 p.m. to 5:30 a.m. or a similar eight-hour period for sleep.

24.     "OJA" means the Oklahoma Office of Juvenile Affairs that is responsible for the care, treatment, and rehabilitation of youth confined at the L.E. Rader Center.

25.     "Qualified medical professional" means a physician, nurse or other medical provider authorized and sufficiently trained to provide the services he or she undertakes to provide.

26.     "Qualified mental health professional" means an authorized mental health care provider authorized and sufficiently trained to provide the services he or she undertakes to provide.

27.     "Rader" means the L.E. Rader Center, located at 13323 W. Highway 51, Sand Springs, Oklahoma or any secure facility that is used to replace Rader, but does not include any separate youthful offender facility the State may operate.

4

28.    "Serious mental illness" means a disorder diagnosed by a licensed psychologist or licensed psychiatrist and in which a patient's perception of reality is impaired, his thinking process is disorganized, or his mood is so depressed, elated, or unstable as to put his safety or the safety of others at risk, and/or to significantly interfere with his capacity to succeed in completing the standard rehabilitative programming provided in the facility.

29.    "Staff" includes salaried and hourly employees and contractual employees providing services at Rader.

30.    "State" means the State of Oklahoma and the Office of Juvenile Affairs.

31.    "Suicide Precautions" means any level of direct monitoring by staff, close watch, observation, or structured and periodically documented staff measures to prevent suicide or self-harm.

32.    "Train" means to instruct in the skills addressed, including ongoing assessment of mastery of instructional material.  Training shall be competency based and shall incorporate testing and instructional methods that establish minimal standards for defining staff competency.

33.    "Use of Force" means any of the following actions taken by staff or a security officer: any physical contact that intentionally restricts the movement of a youth, including a physical restraint.

34.    "Youth" means any person committed by a court to OJA and who is residing at Rader.

## III.  SUBSTANTIVE REMEDIAL MEASURES

### A.    Protection From Harm

35.    <u>Safe Living Conditions</u>  While the State cannot absolutely guarantee the safety of juveniles at Rader, the State agrees to provide safe living conditions consistent with the provisions as set forth herein.

36.   <u>Safe Housing and Supervision</u>  In order to provide safe housing, OJA will ensure that:

      a.      within one year of the effective date of the Consent Decree, a tracking system shall be installed and thereafter utilized, in order to detect unauthorized movement, to prevent youth access in areas that cannot be monitored visually or via stationary security camera, and to monitor access and egress to sleeping quarters, bathrooms, showers and other areas outside of staff line of sight;

      b.      room checks will be completed and documented by staff patrols at staggered order and times;  and,

      c.      OJA shall monitor the activities of all youth. OJA shall provide differential supervision based on the identified needs of the youth.

37.   <u>Inappropriate Relationships Between Staff and Youth</u>  OJA shall maintain appropriate policies, procedures, and practices prohibiting and sanctioning inappropriate  relationships between staff and youth.

38.   <u>Reporting of Possible Abuse, Neglect and Caretaker Misconduct</u>  OJA will continue to enforce its policies, procedures, and practices to ensure that incidents of possible abuse, neglect and caretaker misconduct are reported to the Oklahoma Office of Client Advocacy (OCA).  OJA will continue to enable the use of a direct reporting system by any person that does not require permission or involvement by any other person, via the toll-free hotline to the OCA.  OJA will require its staff, volunteers and interns to report to the Rader Superintendent or his/her designee any alleged, suspected or observed abuse, neglect or misconduct.

39.   <u>Documenting Misconduct and Other Serious Incidents</u>  OJA will continue to ensure that all incidents of staff-on-youth and youth-on-youth violence, use of force, inappropriate staff relationships with youth, and sexual misconduct between youth are documented and reported, with sufficient detail, including the facts of the incident and any physical injury that occurred as a result of the incident. For purposes of this paragraph, the term "staff" shall include volunteers and interns.

40.   <u>Non-Contact Status</u>  The Rader Superintendent or his/her designee shall promptly evaluate allegations of staff abuse or misconduct to make a

determination as to the appropriate level of contact between the staff, interns and volunteers, and youth(s) and document the decision.

41.   <u>Reporting Possible Criminal Violations</u>  OJA will continue to enforce its rule which clearly defines those circumstances in which staff must report possible criminal violations to law enforcement.  OJA will continue to ensure that specific facility staff are trained and designated as responsible for preservation of evidence and are trained in and implement appropriate steps for preservation of evidence.

42.   <u>Review of Incidents by Senior Management</u>  OJA has been accepted for Performance Based Standards (PbS) and will implement PbS practices that require OJA to track and  review all incidents of excessive force, staff-on-youth and youth-on-youth violence, inappropriate staff relationships with youth, and sexual misconduct between youth.  OJA will, utilizing the PbS criteria, provide a report for the Rader Superintendent on a monthly basis to allow the superintendent to target problem areas in the facility and formulate documented plans of action to address such conditions.

43.   <u>Health Care Inquiries Regarding Injury</u>  OJA will continue to ensure that staff from the medical department see all youth known to have been involved in assaults, restraints, or incidents of self-harm.  A nurse or other health care provider will question each such youth, outside the hearing of other staff or other youth regarding the cause of any injury and related medical issues, unless such privacy will subject the youth, staff or facility to risk of harm.  If a private interview is not feasible, and the health care provider deems follow-up is necessary, the health care provider will follow up with the youth in a manner consistent with medical protocols.  As soon as practical, the health care provider also will:

a.   photograph any injury and preserve other physical evidence;
b.   document the matter in the youth's medical record; and,
c.   complete a medical report.

44.   <u>Review of Use of Force Techniques</u>  The Rader Superintendent or his designee, and a Care and Custody Management System (CCMS) qualified trainer will conduct weekly reviews of the use of force reports and video taped

incidents involving restraints to evaluate proper techniques.  Upon this review, staff who exhibit deficiencies in restraint techniques shall receive documented counseling and/or instruction on the proper techniques prior to resuming direct contact with youth.

45.    Staff Training in Behavior Management, De-Escalation and Crisis Intervention   To ensure the least amount of force necessary is utilized to protect the safety of youth and staff, OJA will provide competency-based training to staff in behavior management, de-escalation techniques, appropriate communication with youth, and crisis intervention before staff may work in direct contact with youth.

46.    Youth on Youth Restraints  OJA will establish/modify and implement a written policy that prohibits staff from requesting youth to restrain another youth.

47.    Medical and Mental Health Involvement in Uses of Force  Medical and mental health staff shall be present for planned uses of force, if such staff are present on campus when a planned use of force is executed.  If relaxed prone restraints continue to be used, trained staff shall monitor youth periodically during relaxed prone restraints for signs of abnormal physical distress and whether the youth can speak.

48.    Communication of Medical Alerts, Serious Medication Side Effects, and Recreation Restrictions  OJA shall ensure that the Rader medical and mental health departments screen all youth for medical and mental health conditions that could result in a medical emergency involving the youth, including potential risk from restraints ("medical alerts") and any health conditions that could affect a youth's ability to participate in physical activity ("recreation restrictions").  Medical alerts, recreation restrictions, and potentially serious side effects of youth medications shall be circulated to residential, security, mental health, recreation, and education staff on a daily basis.

49.    Mechanical Restraints In the event that DOJ and the State agree that the limitations contained in the Terry D. Legacy order regarding mechanical restraint are inconsistent with current standards regarding such restraints and that certain restraints currently prohibited will provide a safer environment for youth

at Rader, DOJ and the State will work together to seek an appropriate amendment to the Terry D. Legacy order to allow such mechanical restraints. Should this not be successful, this paragraph will not affect any other requirement of this Consent Decree.

50.   <u>Differential Staffing</u>  OJA will continue to comply with its licensing agency (DHS) standards regarding staffing ratios.  OJA shall conduct a yearly staffing analysis to ensure there are sufficient numbers of adequately trained direct care, mental health care, and supervisory staff to supervise youth safely, protect youth from harm, reduce incidences of violence and injuries to youth and staff, and allow youth reasonable access to medical and mental health services, education, recreation, and adequate time spent in structured activities. OJA must use its best efforts to implement all reasonably possible measures to obtain adequate staffing.

51.   <u>Special Housing Units</u>  Youth who are placed in a special management unit for severe (arms length) suicide precautions, shall not be placed with youth who may disrupt the youth's treatment or harm the youth's physical or mental health.  Treatment plans shall be re-evaluated and updated, as necessary, upon a youth's placement in the Crisis Management Center or within one week thereafter.  OJA shall ensure that youth who are on special housing units for more than 24 hours shall be reviewed by the Superintendent or his designee to determine whether cause exists for any continued confinement.

52.   <u>Internal Classification and Unit Transfers</u>  OJA shall develop and implement an internal classification system that places youth appropriately and safely within the facility, and provides for documented reclassification in appropriate circumstances, which takes into account the youth's safety and treatment needs.  The internal classification system shall be based upon relevant issues such as the youth's age, sexual predatory behavior, sexual victimization, and mental health needs.

53.   <u>Orientation</u>  Within six months of the effective date of the Consent Decree, each youth entering the facility shall receive a written and video orientation that shall include simple directions for reporting abuse and making grievances, instructions regarding facility rules and regulations, the disciplinary and levels systems, and assurance of youth's right to be protected from harm and

from retaliation for reporting allegations of abuse.  Orientation also shall explain how to access medical and mental health care and the grievance system, and provide other information pertinent to the youth's participation in facility programs.

54.   Grievances  OJA shall ensure that Rader has an adequate grievance system that provides youth with access to grievances by contacting any staff, including medical, educational, and custodial staff, and that ensures confidentiality of grievance submissions and staff assistance in the preparation of grievances upon youth request.  In addition, grievance boxes and blank grievance forms shall be placed in the housing units, cafeteria and schools.  Staff who are assigned to resolve grievances shall receive written guidelines and training and shall meet required standards and timelines for resolution of grievances.

55.   Retaliation and Intimidation  OJA will implement a written policy which prohibits staff from intimidating or retaliating against youth who file or seek to file grievances against staff members, volunteers, or other contractual employees.  Institutional training curricula will address this prohibition.

56.   Employment Practices  OJA will perform annual FBI/OSBI fingerprint checks for all Rader direct care employees, starting in the calendar year following the effective date of this Consent Decree unless and until OJA is authorized to conduct NCIC background checks, at which point NCIC checks will be used in lieu of the fingerprint checks.  OJA  shall implement a policy to require all current and future Rader staff to immediately report any arrest, criminal charge, or criminal conviction other than a minor traffic violation; any protective order entered against the employee; and any confirmed finding of abuse, neglect, or caretaker misconduct, if such finding occurs outside the scope of their employment with OJA.  OJA will continue to conduct a state criminal background check and FBI fingerprint check on all new Rader employees.

57.   Contraband Management OJA shall develop and implement policies, procedures and practices to establish a consistent, orderly contraband management program, including:

a.   initial and annual search training for staff responsible for preventing and detecting contraband;

b.   conducting and documenting unannounced random searches of youth and youth living and activity areas by trained staff;

c.   utilizing metal detectors, documenting of major contraband discovered, and proper secure storage and disposal of major contraband;

d.   implementing adequate search procedures for youth returning from vocational programs, visits, off campus activities, and other areas in which youth may come into contact with contraband;

e.   implementing adequate search procedures for youth in specialized programs who are returning to their units from education and other areas in which those youth may come into contact with contraband;

f.   implementing random and targeted drug testing procedures for youth and direct care staff; and

g.   establishing and documenting regular inspection mechanisms to monitor the proper management by staff of tools, hazardous chemicals and cleaning agents, and inventories.

58.   <u>Incentives and Consequences</u>  OJA shall maintain a system of incentive and consequences as a part of Rader's treatment program. OJA shall monitor the system to assure its efficacy.

59.   <u>Safe Housing</u>  OJA shall conduct a survey of all housing at Rader for suicide hazards (e.g., protrusions, grating, conduit piping, broken tiles, etc.). OJA shall then develop and implement policies, procedures, and practices to ensure that all housing for youth on suicide precautions or youth at heightened risk of suicide or self-harm is free of any protrusions and other hazards that would allow youth to hang themselves or commit other acts of self-harm.  In the alternative, such youth shall be adequately supervised to prevent their access to suicide hazards.  OJA shall also perform routine and periodic inspections of housing units to identify potential suicide hazards.

60.   <u>Access to Emergency Equipment</u>  OJA shall ensure that each housing unit contain, and all housing unit staff have immediate access to, appropriate equipment to intervene in the event of an attempted suicide, including cut-down tools, CPR microshields, and first aid kits.  Medical first

responders shall have available filled oxygen tanks.  OJA shall conduct a periodic survey of all emergency and rescue tools and equipment for each unit and ensure adequate tools and equipment for each unit.  OJA shall conduct periodic drills to ensure that staff respond appropriately to suicide attempts.

## B.   Mental Health Care, Including Prevention of Suicide and Self-Harm

61.   Rehabilitation  OJA shall ensure that each youth in residence at Rader has an individualized rehabilitation treatment plan. This plan shall include general goals, specific measurable objectives and target dates by which they should be expected to be achieved, and specific interventions to be included in the youth's rehabilitation.  OJA shall make documented, good faith efforts to include parents or guardians in the creation and revision of such plans, unless a qualified mental health professional determines that parent or guardian participation is likely to be clinically harmful.  Any determination that parent or guardian participation is likely to be clinically harmful shall be documented, based on explicit data and reasoning, in a progress note.  Plans shall reflect appropriate coordination of mental health and substance abuse treatment services.

62.   Rehabilitation Updates  The overall rehabilitation treatment plan shall be reviewed monthly by the youth's unit treatment team.  Goals, objectives, and planned interventions shall be adjusted as a result of this review, to take account of new information regarding the youth.  This information may include information regarding the youth's treatment progress, response to behavior management program, other information regarding the youth's functioning in the facility, information regarding the youth's family or community that may be expected to affect the youth's functioning, or newly available historical information (e.g., from newly received records, or from information newly provided by the youth and/or his family).  Such plans will be reviewed by the unit treatment team at its next meeting, in response to suicide precautions and assessments, or other acute changes in the youth's functioning in the facility and updated accordingly.

63.   Development and Implementation of Policies and Procedures  OJA will implement policies and procedures regarding mental health care, suicide

prevention, intervention, supervision of suicidal youth and substance abuse treatment consistent with the provisions herein.

64.   <u>Mental Health, Suicide and Substance Abuse Screening</u>  OJA shall continue to ensure that all youth admitted to Rader are screened for mental disorders, risk of suicide and substance abuse in a timely manner. The process of this screening will include the following:

a       review of available records;
b.      any observations of the transporting officer, transferring agency, court or similar individuals regarding the youth's potential suicide risk, mental health needs, and substance abuse issues;
c.      interview of available family members regarding the same;
d.      administration of validated screening tools for the same (e.g., MAYSI, SASSI) by personnel qualified to administer;
e.      direct inquiry of newly arrived youth regarding:
      I.      past suicidal ideation and/or attempts,
      ii.     current ideation, threat, or plan,
      iii.    prior mental health treatment including counseling, medication or hospitalization,
      iv.     recent significant loss, such as the death of a family member or close friend,
      v.      history of suicidal behavior by family members and close friends,
      vi.     suicide risk during any prior confinement, and
      vii.    substance abuse history; and
f.      review and interpretation of the tools and other information accumulated by a qualified mental health professional for the purpose of determining need for suicide precaution, and further mental health and/or substance abuse assessment.

65.   <u>Suicide Precautions</u>  Youth identified as being at risk for suicide shall be placed on suicide precautions until they can be assessed by qualified mental health staff.  Youth at risk of suicide include, but are not limited to, youth who are actively suicidal, youth who are not actively suicidal, but express suicidal ideation (e.g., expressing a wish to die without a specific threat or plan) or have a recent prior history of  self-harming behavior; and youth who deny

suicidal ideation or do not threaten suicide, but demonstrate other behavior (through actions, current circumstances, or recent history) indicating the potential for self-harm.  OJA shall ensure that youth placed on suicide precautions are not downgraded and/or discontinued from suicide precautions without an assessment by  a qualified mental health professional.  OJA shall ensure that  staffing levels are maintained based upon the results of the suicide precaution.

66.   <u>Communication among Staff regarding Suicidal Youth</u>  OJA will continue to implement policies and procedures pertaining to the communication among all staff regarding the treatment and management needs of suicidal youth, and specifically:

a.   require that a roster listing all youth on suicide precautions be maintained and updated daily;

b.   require staff on each shift responsible for supervision and observation of youth on suicide precautions to document their review of all relevant suicide observations and their responsibilities regarding suicide observations (e.g., shower and bathroom supervision); and

c.   require that direct care staff have clear notice of all youth on suicide precautions and each youth's level.

67.   <u>Suicide Risk Assessments</u>  OJA will continue to implement policies, procedures, and practices to ensure that qualified mental health professionals conduct timely suicide risk assessments which may include use of valid assessment instruments, review of available youth files/records, and structured clinical interviews for youth exhibiting suicidal, or other self-harming behavior, within 24 hours of the initiation of suicide precautions.

68.   <u>Mental Health Response to Youth at Risk of Suicide or Self-Harm</u> Where a determination is made that a youth represents a continuing risk to himself, the qualified mental health professional will include in the youth's individualized treatment plan a plan for monitoring, intervention and care, and re-evaluation of the youth.  The plan will address ways to help youth develop skills to reduce their suicidal ideations or behaviors, and will provide that youth discharged from suicide precautions receive  follow-up treatment within the

facility, according to the clinical judgment of the qualified mental health professional.

69.    No Punishment for Youth Engaging in Suicidal or Self Injurious Behavior  The Administrators of Programs shall screen proposed disciplinary actions to assure that youth are not punished for suicidal or self injurious behavior.  In instances where it appears that proposed disciplinary action is in response to  suicidal and/or self injurious behavior, those actions will be reviewed and addressed by the Institutional Treatment Team, who shall determine the appropriate, clinical response to the conduct.

70.    Implementation of Policy Regarding Youth at Risk of Suicide or Self Harm  OJA shall implement policies, procedures and practices to ensure that staff sufficiently supervise and interact on a daily basis with all youth on suicide precautions and document the type and frequency of supervision.  OJA will ensure that any direct care staff member who identifies a youth as suicidal or at risk of self-harm immediately will place the youth on constant observation and refer the youth to the supervisor in charge, who will place the youth on suicide precautions,  document the reason for placement on suicide precautions and the level of precautions, and refer the youth to a qualified mental health professional for assessment.

71.    Documentation of Youth on Suicide Precautions   OJA will continue to develop and implement policies, procedures, and practices to ensure that direct care staff who supervise a youth on suicide precautions systematically document the following information:

  a.    the times youth are placed on and removed from precautions;
  b.    the levels of precautions on which youth are maintained;
  c.    the housing location of youth on precautions;
  d.    the conditions of the precautions; and
  e.    the times and circumstances of all observations by staff monitoring the youth.

Unit managers will conduct daily reviews of the Suicide Precaution Observations Record (SPOR) and sign off on such daily reviews.

72.   Access to Programs and Services by Youth on Suicide Precautions
OJA will continue to develop policies, procedures, and practices to ensure that youth on suicide precautions continue to receive programs and services, in accordance with safety and security needs, and in accordance with the clinical judgment of a qualified mental health professional.  If programs and/or services are modified as a result of the placement on suicide precautions, the qualified mental health professional will document the change and reason for change  in the SPOR.

73.   Step-Down and Follow-up Assessments  Only a qualified mental health professional shall be able to modify a youth's suicide precaution level. Such modification shall be documented.  At a minimum, all youth who have been discharged from suicide precautions shall be assessed by a qualified mental health professional within three (3) day of discharge to determine and document current level of risk and need for further follow-up and/or ongoing treatment, except in instances in which the qualified mental professional has determined and documented that no need for follow-up exists.

74.   Critical Incident Review  OJA will develop and implement policies, procedures, and practices to ensure that a multi-disciplinary review team is established to review all suicides and serious suicide attempts for policy and training implications.  Reviews will include all components identified in Rader's policy regarding Suicide Prevention and Intervention Program. At a minimum, the review will include:

a.   critical review of the circumstances surrounding the incident;
b.   critical review of procedures relevant to the incident;
c.   synopsis of all relevant training received by involved staff;
d.   pertinent medical and mental health services/reports involving the victim;
e.   possible precipitating factors leading to the suicide or attempt; and
f.   recommendations, if any, for changes in policy, training, physical plant, medical or mental health services, and operational procedures.

75.   Staff Training  OJA will continue to conduct suicide prevention training for all staff who have regular direct contact with youth.  This training will stress juvenile suicide research, potential predisposing factors to self harm, high-risk suicide periods, and warning signs and symptoms.  Within six months

16

of the effective date of this Consent Decree, OJA will ensure that all existing and newly hired staff who have direct contact with youth receive an initial eight-hour training. Following completion of the initial training, OJA will ensure that such staff complete an additional two hours of refresher training each year. At a minimum, the suicide prevention training curriculum will include the following topics:

a. a suicide prevention policy consistent with this Consent Decree;
b. juvenile suicide research;
c. ways in which facility environments may contribute to suicidal behavior;
d. potential predisposing factors to suicide;
e. high risk suicide periods;
f. warning signs and symptoms of suicidal behavior;
g. identifying suicide risk despite the denial of risk;
h. case studies of recent suicides and serious suicide attempts;
I. strategies for de-escalating youth engaging in self-harming behaviors; and
j. the proper role of medical and other staff in responding to a suicide attempt by youth, including mock demonstrations and proper use of emergency equipment.

76.   <u>Mental Health Assessment</u>   OJA shall implement policies to ensure that youth whose mental health screens, placement on suicide precautions or conduct (i.e. placement within BMU, CMC or MHSU units or failure to progress within normally expected time-frames) indicates a possible serious mental illness which may require mental health services beyond the general rehabilitative treatment program shall be assessed by a qualified mental health professional. The assessment shall be completed within three (3) weeks of the triggering event.  The assessment techniques shall include:

a. review of all available previous mental health records,
b. consultation with the unit treatment team,
c. diagnostic interview with the youth,
d. interview with family members, as possible, and
e. other specialized diagnostic consultation, as indicated.

17

The assessment content shall include:

a.    family history of mental illness and substance abuse,
b.    developmental history,
c.    family relationships,
d.    school and work history,
e.    peer functioning and interests,
f.    substance abuse,
g.    conduct problems,
h.    trauma exposure and responses,
I.    history of mental health symptoms and treatment,
j.    mental status,
k.    results of any specialized consultation,
l.    diagnostic formulation by a licensed psychologist or licensed psychiatrist, and
m.    recommended mental health interventions.

77.    Mental Health Record System/Communication  For the youths previously diagnosed as having serious mental illness, OJA shall develop and implement policies, procedures and practices to ensure that such youth's most relevant current information is provided to the psychiatrist by the psychological clinicians on the day of such youth's appointment with the psychiatrist for review and entry into the youth's medical record.  Additionally, for the safety of such youth, OJA shall develop and implement policies, procedures and practices to ensure that information from such  youth's visit with the psychiatrist, including any referrals for medications and their side effects, or other treatment interventions, are communicated to the psychological clinicians, who shall communicate this information to the unit managers to share with appropriate Youth Guidance Specialist (YGS) staff and to share with staff at Unit Treatment Team meetings.

78.    Duties of the Psychiatrist  Each youth whose serious mental illness requires psychiatric services, including monitoring of the use of psychotropic medications, shall be under the care of a licensed psychiatrist.  OJA shall employ or contract for sufficient psychiatric services to treat youths with serious mental illness.  The psychiatrist also shall be involved in the psychopharmacology screening process of such youth.

79.   <u>Dispensing of Mental Health Medications</u>  OJA shall develop and implement policies, procedures, and practices to ensure that psychotropic medications are prescribed, distributed, and monitored properly and safely.  OJA shall ensure that all psychotropic medications are dispensed by appropriately trained medical care staff who consistently implement adequate policies and procedures to prevent cheeking and/or hoarding of medications.

80.   <u>Clinical Oversight</u> OJA shall provide formal clinical oversight/supervision of the mental health professionals providing services to youths with serious mental illness, based upon their experience and skill.

81.   <u>Staff Training</u> OJA shall develop and implement training for all medical staff at Rader responsible for medication administration on current issues in psychopharmacological treatment, including information necessary to monitor for side effects and efficacy, to prevent medication discontinuity.

82.   <u>Transition Planning</u>  OJA shall ensure that appropriate staff create transition plans for youth with serious mental illness before leaving Rader. Plans shall include providing the youth and his parents or guardian with information regarding mental health resources available in the youth's home community; making referrals to such services when appropriate; and supplying appropriate psychiatric medications upon release from the facility, when feasible.

## C.   Special Education

83.   <u>Provision of Services</u>  The State shall continue to provide all youth confined at Rader with the special education services it is legally mandated to provide by the Individuals with Disabilities Education Act ("IDEA") and Section 504 of the Rehabilitation Act of 1973 ("Section 504") and regulations promulgated under those sections.

84.   <u>Education Coordinator</u> OJA shall appoint a qualified education coordinator within OJA whose duties in relation to Rader shall include:

a.   monitoring the special education and related programming in the facility, including development and implementation of policies and training programs;

b.      monitoring whether special education staffing and resources are sufficient to provide adequate special education services to youth at the facility and to ensure compliance with this Consent Decree;

c.      ensuring that an adequate vocational education program is available for youth with disabilities at Rader;

d.      ensuring that annual in-service training for education staff to enhance their ability to implement their duties under the provisions of this Consent Decree is provided; and

e.      ensuring that a policy and procedures manual for implementation of services at Rader pursuant to the IDEA and Section 504 is developed and implemented.

85.      Identification of Youth Previously Determined Eligible for Services The State shall promptly determine if admitted youth were previously eligible for special education services upon their admission.  This shall include ensuring that documented prompt and periodic requests for school records from the previous school district are made to confirm eligibility and to learn what services the student was receiving.  This prompt request shall occur, absent exceptional, documented circumstances, within three (3) business days of the student's admission to Rader.  If records are not received within ten (10) business days from the date of the request, the State shall ensure that procedures with the Oklahoma State Department of Education to address any barriers to receipt of the requested materials are initiated.  The State shall ensure that documented good faith efforts to obtain these records are continued until received or determined unrecoverable.

86.      Identification of Potentially Eligible Youth  Consistent with federal regulations, the State shall ensure prompt and adequate screening of youth who may be eligible to receive special education services but have not been so identified in the past.  Such screenings shall include:

a.      interviewing youth upon enrollment to determine past receipt of special education services, reviewing education records and court-ordered assessments, and observing classroom performance.  Such review should occur, absent exceptional, documented circumstances, within five (5) business days of the receipt of records or, in the case where no records have been received or receipt of

20

records is delayed, within ten (10) business days of the student's admission to Rader;

b. adequate observation and assessment of a youth's substantive educational knowledge, and performing necessary vision and hearing tests. Results of vision and hearing tests will be shared with the school personnel; and,

c. implementing an Intervention Team to perform pre-referral functions, including implementation of written criteria under which staff or teachers must refer a student for review, frequency at which interventions must be reviewed, and procedures for referral for comprehensive evaluation if interventions are unsuccessful.

87. <u>Eligibility Determinations</u> The State shall ensure that all students referred for eligibility assessment receive comprehensive evaluations for all suspected disability categories and related services needs. This includes:

a. ensuring that all required education and psychological tests, behavioral observations, functional assessments, and social and school history information are compiled and reviewed for each student and that said review is documented; and

b. implementing policies describing the criteria for multi-disciplinary team decision-making regarding eligibility for special education; and reviewing existing data to determine continued eligibility as needed.

88. <u>IEP Development</u> The State shall ensure that IEPs for eligible youth at Rader satisfy the requirements of the IDEA. This includes:

a. fully completing each required section of the IEP to reflect the youth's individual needs;

b. fully justifying the placement in the Least Restrictive Environment and utilizing a range of service delivery options within Rader as appropriate, to the extent that it does not require a placement outside the Rader campus; and

c. ensuring the provision of training on IEP development to educational staff responsible for writing IEPs, including dissemination of concrete examples.

89.   <u>IEP Implementation</u>  The State shall ensure that all eligible students receive special education instruction and all related and transitional services required by their IEP. The State shall ensure that youth requiring special education services at Rader receive services within the Rader School that meets their needs.  If a special education student is assigned to a specialized unit for longer than ten (10) school days and such assignment changes his educational service delivery, the IEP team will convene to determine whether the current IEP is sufficient to meet the youth's educational needs.

90.   <u>Parental Involvement</u>  The State shall ensure that parents/guardians are sent all required notifications and progress reports regarding special education services as appropriate.  The State shall also ensure that parents are given opportunities to participate in the special education decision making process, including eligibility determinations and transition planning.

91.   <u>Section 504 Plans</u>  The State shall ensure that appropriate Section 504 plans are developed and implemented for youth referred for 504 accommodations by the Intervention Team.

92.   <u>Length of School Day</u>  Beginning with the 2008 Fall session, the State shall ensure that youth at Rader who are receiving special education services are provided with the number of instructional hours required by the Oklahoma State Department of Education's rules. As of the effective date of this Consent Decree, special education students assigned for more than a total of ten (10) school days during a school year to a specialized housing unit will receive the same number of instructional hours as those students in the general Rader education program unless the IEP team makes a determination that the student should receive less than a full day of instruction.

## IV.  INVESTIGATIONS AND QUALITY ASSURANCE

93.   <u>Investigations</u>  OJA shall institute policies, procedures, and practices for prompt, adequate investigations and review by Rader's senior management of all incidents involving:

    a.    those that cause serious harm or threat of serious harm to youth, including but not limited to, rape, sexual assaults, sexual

22

relationships, uses of force, restraints, serious injuries, assaults, and self-harm;

b.      the presence of major contraband;

c.      incidents of violence, regardless of whether such incidents resulted in serious injuries; and

d.      uses of force resulting in an injury to a youth, uses of force for which there has been an allegation of excessive use of force, and uses of force for which evidence (i.e., a videotape) indicates possible excessive use of force.

OJA shall adopt and implement standards for investigation of incidents, with the first priority being criminal violations, second priority being violations of OJA/Rader policy and procedures, and final priority being a trend analysis that is necessary to ensure that systematic corrective action may be taken in an effort to prevent future incidents.  It is  preferred that the investigator conducting the adequate investigations be Counsel on Law Enforcement Education and Training (CLEET) certified with limited jurisdiction and an employee of OJA.

94.    Quality Assurance Programs and Action Plans  The State shall develop and implement Quality Assurance programs for each discipline addressed in this Consent Decree.  Each program shall include the following:

a.      inspection of a sample of all documents used by Rader to document compliance with the relevant standard, including institutional, medical, educational and mental health records;

b.      interviews of facility administrators, staff, youth, and parents, as appropriate; and

c.      observations of facility operations and inspections of the physical plant.

95.    Quality Assurance Team There shall be a Quality Assurance Team, the leader of which shall report directly to the OJA Executive Director.  The Quality Assurance Team shall conduct audits and issue reports documenting the status of compliance using the above methodologies.  The Quality Assurance Team shall conduct targeted reviews as necessary in between these audits to assess progress in addressing areas in which standards are not being met.   OJA management staff shall review the audits and reviews to determine progress and compliance.

96.   <u>DOJ Review of Quality Assurance Program</u>  Quality Assurance Programs shall be submitted to the Department of Justice for review within one hundred twenty (120) calendar days of the effective date of this Consent Decree. The Department of Justice shall provide written guidance to the State, including specific explanations as to how the Quality Assurance Program(s) is inconsistent with the terms of the Consent Decree, and shall suggest revisions in writing, if any, within forty-five (45) days of receipt of any such Quality Assurance Program affecting this Consent Decree.

97.   <u>Long Term Plan of Action</u> While not mandatory for compliance, it would be highly beneficial for OJA to create a long term plan of action in conjunction with outside expertise for each discipline addressed in this Consent Decree (protection from harm, mental health and special education) as well as in other areas to ensure continuous improvement of services provided to youth at Rader.

## V.  COMPLIANCE

98.   <u>Document Development and Revision</u>  Within ninety (90) calendar days of the effective date of this Consent Decree, OJA will provide DOJ with copies of OJA and Rader policies and procedures, forms, screening tools, blank log forms, and any proposed revisions to these materials that it will rely on to implement the provisions of this Consent Decree.

99.   <u>DOJ Review of Materials</u>  Within ninety (90) calendar days of its receipt of these policies and procedures, DOJ shall provide in writing any concerns or objections it has to the policies and procedures, including proposed revisions and specific explanations as to how the plan is inconsistent with the terms of the Consent Decree.  DOJ's failure to respond will be deemed an approval of the policies and procedures.   In the event that DOJ asserts that policies, procedures, and other written documents are not in compliance with the terms of this Consent Decree, the parties will agree to a schedule for OJA to submit revisions.  Upon request, DOJ will provide technical assistance regarding revisions to bring materials into compliance.

100.    <u>Training</u>  OJA shall provide and document initial and refresher training to all facility staff with respect to newly implemented or revised policies and procedures.

101.    <u>Technical Assistance by DOJ</u>  In the event that the State and/or OJA requests reasonable technical assistance from DOJ, DOJ will provide the State and/or OJA with such technical assistance as requested by the State, including assistance in the development of policies and procedures required to effectuate the terms of this Consent Decree.  DOJ also will assist the State in identifying additional financial or technical resources to supplement those resources currently allocated to the facility.

## VI.  OVERSIGHT AND ENFORCEMENT

102.    <u>Expert Selection</u>  DOJ has designated John Platt (protection from harm/suicide); Richard Barnum (mental health/suicide); and Kelly Dedel (special education, suicide and quality assurance/investigations) to provide oversight and confirmation that the State and OJA are complying with the terms of this Consent Decree in their respective areas of expertise.  Should any expert be unable to provide this service, DOJ has the right to designate another expert with comparable experience and expertise in their stead.  DOJ shall pay all fees and expenses incurred by its experts.  DOJ also shall pay any costs related to copying documents DOJ or its experts may request that exceed $500.00 per visit.

103.    <u>DOJ and Expert Access</u>  DOJ and its experts shall be allowed full and complete access to Rader, all facility and OJA records related to Rader and this Consent Decree, and staff once every six (6) months for a period of reasonable number days not to exceed four (4) days, during the term of this Consent Decree.  DOJ and its experts' access to residents shall be limited to times when the residents' counsel is present, unless the right to counsel has been waived.  DOJ and its experts shall be entitled to conduct interviews of youths outside of the presence of the Defendants.  DOJ and its experts shall be entitled to additional access to Rader or OJA records upon agreement of OJA's Executive Director.  DOJ and its experts shall provide OJA with a minimum of thirty (30) calendar days notice of the intended visit.  OJA has the option of providing its own experts and attorneys to accompany DOJ and its experts on any site visit.  OJA shall direct all employees to cooperate fully with the experts.

All non-public information obtained by DOJ and its experts shall be maintained in a confidential manner.

104.   <u>Limitations on Public Disclosures by All Experts</u>  Except as required or authorized by the terms of this Consent Decree or the parties acting together, the parties' expert shall not:  make any public statements (at a conference or otherwise) or issue findings with regard to any act or omission of the State or its agents, representatives or employees, or disclose non-public information provided to the experts pursuant to this Consent Decree.  Any press statement made by the experts regarding his or her employment must first be approved in writing by both parties.  The experts shall not testify in any other litigation or proceeding with regard to any act or omission of the State, OJA or any of their agents, representatives, or employees related to this Consent Decree, nor testify regarding any matter or subject that he or she may have learned as a result of his or her performance under this Consent Decree.  Reports issued by DOJ's experts shall not be admissible against the State in any proceeding other than a proceeding related to the enforcement of the State's Consent Decree with DOJ.  Unless such conflict is waived by the parties, the experts shall not accept employment or provide consulting services that would present a conflict of interest with the experts' responsibilities under this Consent Decree, including being retained (on a paid or unpaid basis) by any current or future litigant or claimant, or such litigant's or claimant's attorney, in connection with a claim or suit against the State or its departments, officers, agents or employees.  The experts are not a State or local agency or an agent thereof, and accordingly the records maintained by the experts shall not be deemed public records subject to public inspection.

105.   <u>DOJ Expert Reports</u>  Within sixty (60) days of any inspection, DOJ's experts shall prepare and provide the parties with reports describing the steps taken by the State and OJA to implement this Consent Decree and evaluate the extent to which the State has complied with each substantive provision of the Consent Decree.  The expert shall express his or her opinion, paragraph by paragraph, regarding whether the State and OJA have complied with each paragraph of their respective sections of this Consent Decree.  In each report, the Expert shall evaluate the status of compliance for each provision of the Consent Decree using the following standards:  (1) substantial compliance, (2) partial compliance, and (3) non-compliance. These reports shall be written with due regard for the privacy interests of individual youth and staff and the interest of

the State in protecting against disclosure of non-public information.  Each
expert's  report shall describe the steps taken to analyze conditions and assess
compliance, including documents reviewed and individuals interviewed, and the
factual basis for each of the expert's opinions.  The State and/or OJA shall have
the option to submit a written response to the reports within sixty (60) days from
OJA's receipt of the report.

106.    <u>Technical Assistance by the DOJ Experts</u>  DOJ's experts shall
provide the State with reasonable technical assistance as requested by the State.

## VII.  REPORTING REQUIREMENTS AND RIGHT OF ACCESS

107.    <u>State Documentation of Compliance</u>  The State shall maintain
sufficient records to document its compliance with all of the requirements of this
Consent Decree.  The State also shall maintain (so long as this Consent Decree
remains in effect) any and all records required by or developed under this
Consent Decree.

108.    <u>State Reporting Requirements</u>  OJA shall send to DOJ Rader's
superintendents' report monthly.

109.    <u>Privileges</u>  This Consent Decree shall not be deemed to waive the
attorney/client, attorney work product, deliberative process, or executive
privileges.  The State shall not assert physician/patient or psychotherapist/patient
privileges with respect to the monitoring of this Consent Decree by DOJ and its
experts.

## VIII.  IMPLEMENTATION AND TERMINATION

110.    <u>Information to Employees</u>  The State shall provide information to
all current and future relevant State employees about the terms of this Consent
Decree to the extent necessary to carry out their job duties and responsibilities in
relation to the terms of this Consent Decree.

111.    <u>Implementation</u>  Except as otherwise noted, the State shall
implement all reforms necessary to comply with this Consent Decree within one
(1) year of the signing of this Consent Decree.  Minor, inconsequential, sporadic,
unintentional or isolated harmless instances of noncompliance with the Consent

Decree shall not be a basis for enforcement, provided they do not affect a substantial interest of the youth.

112.    Enforcement  If DOJ believes that the State has failed to substantially comply with any obligation under this Consent Decree, DOJ will, prior to seeking judicial action to enforce the terms of this Consent Decree, give written notice of the failure to the State.  The parties shall conduct good-faith discussions to resolve the dispute.  The parties shall attempt in good faith to resolve the dispute for a minimum of 30 days prior to initiating any court action. DOJ commits to work in good faith with the State to avoid enforcement actions. However, in cases of emergency posing an immediate threat to the health or safety of youth, DOJ shall give the State notice but will not be required to comply with the 30-day good faith discussion requirement.

113.    Compliance Coordinator  OJA shall designate a person to serve as a Compliance Coordinator to coordinate and oversee compliance with this Consent Decree.

114.    Termination  This Consent Decree shall terminate three (3) years from the date it is ordered by the Court.  There are three substantive sections of this Consent Decree – protection from harm, mental health care, and special education.  The Consent Decree, or any substantive portion of the Consent Decree, may end earlier than three (3) years from the date it is ordered by the Court if the State has substantially complied with each of the provisions of the Consent Decree or a substantive section of the Consent Decree, and has maintained substantial compliance for at least one (1) year.  The burden shall be on the State to demonstrate this level of compliance.  Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance will not constitute failure to maintain substantial compliance.  At the same time, temporary compliance during a period of sustained noncompliance shall not constitute substantial compliance. Under no circumstances will this Consent Decree be extended beyond the three (3) year period, unless by agreement\ of the parties and the Court that some portion of the Consent Decree needs to be extended for compliance.

115.    Dismissal of All Defendants  Upon completion of this Consent Decree as discussed in paragraph 115, the parties will jointly move, pursuant to Fed. R. Civ. P. 41(a)(2), for entry of an order dismissing this action with

prejudice as to all Defendants named in the complaint or subsequently added thereto.  The Court shall retain jurisdiction over the case until a final dismissal is entered.

116.    <u>Successors</u>  This Consent Decree shall be binding on all successors, assignees, employees, agents and all those working for or on behalf of the State.

117.    <u>No Waiver for Failure to Enforce</u>  Failure by either party to enforce this entire Consent Decree or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Consent Decree.

118.    <u>Notice</u>  "Notice" under this Consent Decree shall be provided by courier or overnight delivery and shall be provided to the Governor of the State and to the Attorney General of the State.

119.    <u>Unforeseen Delay</u>  If any unforeseen circumstance occurs which causes a failure to timely carry out any requirements of this Consent Decree, the State shall notify the DOJ in writing within twenty (20) calendar days of the time that the State becomes aware of the unforeseen circumstance and its impact on the State's ability to perform under the Consent Decree.  The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure.

120.    <u>Subheadings</u>  All subheadings in this Consent Decree are written for convenience of locating individual provisions.  If questions arise as to the meanings of individual provisions, the parties shall follow the text of each provision.

121.    <u>Severability</u>  In the event any provision of this Consent Decree is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Consent Decree.

122.    <u>Attorney's Fees and Expenses</u>  Each party shall bear the cost of their fees and expenses incurred in connection with this cause.

FOR THE UNITED STATES:

_David E. O'Meilia (signature)_

DAVID E. O'MEILIA
United States Attorney
Northern District of Oklahoma
Attorney for Plaintiff

_Wyn Dee Baker (signature)_

WYN DEE BAKER, OBA No. 465
Assistant United States Attorney
Attorney for Plaintiff
United States Attorney's Office
Northern District of Oklahoma
110 West 7th Street
Suite 300
Tulsa, Oklahoma 74119
(918) 382-2700

_Grace Chung Becker (signature)_

GRACE CHUNG BECKER
Acting Assistant Attorney General
Civil Rights Division
Attorney for Plaintiff

_Shanetta Y. Cutlar (signature)_

SHANETTA Y. CUTLAR
Chief
Special Litigation Section
Attorney for Plaintiff

_Judy C. Preston (signature)_

JUDY C. PRESTON
Deputy Chief
Special Litigation Section
Attorney for Plaintiff

_Laura L. Coon (signature)_

LAURA L. COON
JE YON JUNG
STACEY K. GRIGSBY
SHAHEENA AHMAD SIMONS
Trial Attorneys
Attorneys for Plaintiff
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-6255

30

FOR THE STATE and OJA:

TOM GRUBER
First Assistant Attorney General
State of Oklahoma

SO ORDERED, this ___9th___ day of ___September___, 2008.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma

31